The next case for argument is 23-1428, Egenera v. Cisco. Mr. Brunelli, whenever you're ready. Good morning, and may it please the Court. My name is Robert Brunelli. I represent Egenera. Egenera asserted independent claims 135 and 7 of the 430 patent against Cisco's Unified Computing System, sometimes called UCS. District Court granted summary judgment of non-infringement of claims 1 and 5, finding that Egenera failed to generate evidence showing that the CPUs, which are included as part of each Cisco UCS, participated in emulation of Ethernet functionality that is provided by the UCSs. Claims 3 and 7 were tried to the jury. The jury found those claims not infringed and not invalid. Egenera appealed, seeking reversal of the summary judgment order and a remand. Can you talk about the summary judgment piece? I'm not sure which side here is causing me greater concern about that. The reason I say that is that what, at least to me, is strikingly absent is a meaningful explanation from experts from wherever of what under the hood, concretely, it means to emulate Ethernet functionality. And without that, when I hear this debate, they say and the judge said, well, just using it, using Ethernet functionality is not emulating it. And you say, well, yeah, it is. And I say, okay, how do I resolve that? And I'm not informed about what emulating Ethernet functionality is. I need some light shed on this. All right. And ideally, if it's in the record, that would be even better. I would direct the court. So in context, so what does emulate Ethernet functionality mean? Like in toto, it means all sorts of things. But in the context of this summary judgment motion, the dispute seems to be at one level. Does being able to communicate from the CPU using the MAC address to other components of the UCS, is that being able to communicate piece part of emulation of Ethernet functionality? Just to be clear, there's another claim element that I think is one of the issues on the JML. This is not one where the claim element says the logic has to be establishing the ability to use Ethernet to emulate functionality. It's just emulating. Unlike whatever the other, about the network topology or something. Establishing the network topology. But I want to stick with the emulate part. Yes. But what are we emulating? We're emulating, if we look at claim five, for instance. Let me just say, it may well be that your answer to this is that without an explanation, you can't do summary judgment on this. That is part of my argument, yes. So wait, does that mean you're conceding there is no explanation in the record? There's no explanation in the court's order on the summary judgment. Did anyone ask for claim construction? Interestingly, aspects of this particular term were submitted to claim construction. Just the processor part. Correct. And no, there was claim construction on whether. The later clause, the later words, the internal communication network, that's what there's a page and a half in the claim construction opinion about, but not about what it means to emulate Ethernet functionality. That is absolutely true, Your Honor. So my question remains, did anyone request claim construction? No. And you haven't appealed for the lack of a claim construction, correct? Correct. So I don't see how this provides a basis for reversing summary judgment. Do you have an answer? Yes. So if there's no claim construction, we're looking at plain and ordinary meaning. And if we're looking at plain and ordinary meaning, we look at the specification. The best evidence of what the plain and ordinary meaning of terms in the claims are is the specification to the patent. If we look at Appendix 103, which is columns three and four of the 430 patent, we see at lines 55 to 60 a discussion of, quote, each pane through software commands is configured to have a corresponding subset of processors that may communicate via the virtual local area network that is emulated over the PTP mesh. And it continues. So what is the plain and ordinary meaning of emulating the Ethernet? Well, the evidence in the record is that the MAC addresses are programmed into the CPUs and that they are then used to communicate as part of the overall PAM. And so if what we're... Just to be... I know that there was, at least in my mind, there was some confusion about this. You're not any longer disputing, if you ever were, that the CPU does not itself get assigned a MAC address, but you're saying that the CPU has MAC addresses of other components within the system that are assigned them, and the CPU, when it sends messages out, will use those MAC addresses in sending those messages out. Is that a correct understanding? It is correct. Except one small modification. The MAC address is the MAC address of the universal computing system. So you've got the board, you've got four or six CPUs on it. Each of those CPUs gets the same MAC address because it's all one MAC address assigned to that. Okay, it's just not different from the larger outfit of which it's a part that has the MAC address.  Okay. Yeah. Can I just ask you, I guess, about the JMAL part of this? In a way, at least, I've been thinking about this as, I don't know, sort of presenting something like the same issue. That is, for each of the three claim terms that you're focusing on here, the claim construction takes one only so far, and then, in that circumstance, it is the rule, which we've articulated lots of times, that when there's no longer a dispute about claim construction, then the fact findings under it are permissible as long as they are one reasonable application of either the unconstrued term or the construction that is not further construed. And it seems to me that gives you a problem for each of the three JMAL issues. It may actually be helpful to you on the summary judgment point, because without a construction of emulating Ethernet functionality, anything that's reasonable would be a jury issue. But now on the JMAL part, why isn't each of the conclusions or findings that we attribute to the jury about the address and about the modifying, and I can't remember what the third one was, within the range of the reasonable as an application of the claim limit limitation that's at issue? So I've got... Sorry, there was a lot in that question. No, that was good, though. So what I want to say is that it's almost jumping over your question and going to the request for a new trial, saying the jury got confused. Yes, I want to concentrate on the JMAL evidence. So I think you raise a good point. Those arguments really come down to the claim construction issues. What do those terms mean? And because it's a plain and ordinary meaning, can we accept what the jury decided? Yeah, I think you probably can in that context. But we don't know what the... We have a general verdict form here, not a specific. So we don't know which of those three, if... All we know is maybe one of those three applied, unless they got confused by... You have to show us that under the plain and ordinary meaning, the jury could not reasonably, having taken all the evidence against you, could not reasonably reach any one of those three conclusions, correct? Correct. And that is in this detail. Thank you for conceding. Just one quick question on the new trial motion. I understand why you were unhappy with what the judge said in one sentence of his not even preliminary instructions, but just what he said basically to welcome the jury and assure them what a patent is. And he colloquially said, you know, patent infringement is like copying, something to that effect. You now want to turn that into... You say that set the tone for the entire trial and was foundational to the case. Those, like, handful of words before the jury even started, before preliminary instructions, before evidence, before final instructions, and yet you wait till right near the end of trial, 10 days later, to even ask for any cure. How could that possibly be an abuse of discretion and so prejudicial that we should reverse? So on the new trial issue, it's a totality of the circumstances standard, as I understand it, essentially. And so we have to look at everything. That was the first domino in the series of copying dominoes that were included in the overall case. We had that instruction followed by an instruction that the court wouldn't give about if you've got your own patent, you can still infringe, which is a... Right, but you properly instructed on what infringement is at length, correct? Correct. We didn't raise any issues with regard to the instructions he did give, correct. We've got the lay witnesses providing in the context of we didn't copy, we don't infringe, and then we've got a closing that uses the word copying over 30 times, more than infringement. Wasn't copying something that you put a lot in the record, too, throughout this trial? I mean, they weren't using this word copying. I thought it was central part of your case. You had a willful infringement claim, right? He generally did. It's not copying. He generally absolutely did. Not surprising there was copying evidence.  All right. Why don't we reserve the interview if I don't want to hear from the other side. Good morning. Good morning. May it please the Court. Elizabeth Moulton for Cisco. Cisco's UCS system operates in fundamentally different ways than EGENERA's claim system. And the main difference relevant here is that Cisco's system groups servers into virtual networks, whereas EGENERA's claim system is about grouping processors into different networks. Because EGENERA wanted to group processors together, its claims have really specific limitations about what needs to happen on the processors themselves to create their network. In contrast, Cisco's innovation was about how to group servers. So the logic and computer software for creating the server networks is found on our customized network interface cards that sit on each server and mediate between the processors and the fabric interconnect or the control node. That basic architectural difference meant that EGENERA couldn't show infringement either at summary judgment or at trial. Because Cisco doesn't put the network emulation or... Yeah. Talk about the emulation because in particular, I guess, the way that I've been thinking about it led me to be struck by your use several times of expressions, just in your introduction here, about creating the network, which I understand is a fair description of the claim limitation about establishing the network topology. It doesn't feel to me like it's a fair description of the emulate term.  So just to be clear, we're talking about both Claims 1 and 5. Yes. And Claim 1 specifically has the logic... Neither side has argued any difference between the language, having the logic to emulate and emulating, right? That's right. And the district court treated them the same at Appendix 49. The district court says the claims require the CPUs include some logic to emulate Ethernet functionality or to emulate Ethernet functionality in some respect. So both Claims 1 and Claim 5 require that the processors be doing something to create or emulate the Ethernet functionality. Not create. To actually do the emulation. Do the emulation. So it comes down to what it means to emulate the functionality. And that's where I, you know, early on, start looking for something to, you know, some expert report, something that, or some claim construction analysis where it is explained and I come up empty. Sure. So the plain meaning in light of the specification of emulating Ethernet functionality... The word plain is not going to do it. Okay. Fair enough. What the district court was confronted with at summary judgment is the evidence that EGENERA put forth, which is that 4127 is the excerpt of their expert report. That expert report says that there is logic to emulate the VNICs and related interfaces. So the VNIC is the network interface card. Emulate Ethernet functionality. That's Appendix 4127, Paragraph 211. So that's the evidence the district court has. And EGENERA says, okay, the VNICs emulate, the processors use. And the district court... No, it didn't say that. Sorry? It didn't say the processors don't emulate. It says the processors do emulate. And how do they emulate? By communicating over and using. So the EGENERA's evidence was that the processors... Sorry, their evidence is that the VNICs emulate. Their argument in their summary judgment brief at 5222-224 is that the processors use the emulated functionality to communicate over the emulated network. And that that constitutes emulating. That the use and communication constitutes emulating. That's their attorney argument. When the district court is confronted with that, he says your evidence is the VNICs do the emulation. Your argument is that the CPUs use the emulated functionality created on the VNICs. That doesn't meet the claim language. There wasn't any factual dispute to resolve or any claim construction dispute. It was simply the district court saying, the evidence you put forth doesn't match the claim limitation, so there's no infringement. And that's a perfectly appropriate analysis at summary judgment. If you want to... I can go through what is actually happening on the CPUs with the VNICs MAC address, if that would be helpful. But I think the basic point is just the evidence put forward didn't match the claim limitation. And because there wasn't any claim construction that would expand emulation to just include use of the functionality created by the VNICs, there was no infringement. What if we were to now think that is a claim construction dispute, although I recognize no one asked the district court and no one is seemingly asking us. What if we're left with that feeling nonetheless? So I don't think the court should engage in sort of sua sponte claim construction or tell the court, the district court, it needed to do claim construction. EGENER, as the patentee, should have raised that if they thought there was a dispute and that they thought use should encompass emulation or emulation should encompass mere use. But I guess I think I tried to articulate this a little bit when your friend on the other side was speaking. When there is a term and its application is not yet clear from exactly what the claim construction has been or from the language if it hasn't been construed, same thing. Then the rule is, we've said this a number of times, the LSI opinion last year and a number of times, and it has to be the rule, right? If there's no further claim construction, then it's up to the jury to decide within the range of any reasonable application of this term. So I don't see how you can win on that If we think there's uncertainty about whether communicating over and using is emulation and we don't have a reason yet to see why that position is just not reasonable under the language of emulate functionality, then you can't give summary judgment. You either need to go back and construe it and maybe then claim summary judgment is possible. But not without the construction. That's where I guess I'm stuck. Understood. So a couple things. Originally leading up to summary judgment, the dispute over emulated Ethernet functionality was that Cisco's system actually uses Ethernet functionality. It doesn't emulate. So there was actually a claim construction dispute about whether directly using Ethernet constituted emulation. That's because in the internal communication network, your system actually uses Ethernet. And their system used the GigaNet network. So that's why that really was the focus of discovery in some of the initial fights about what this claim term meant. When we got to summary judgment, at that point eGenera's evidence was just that emulation is happening on the NICs. And so we said, okay, that doesn't meet the claim limitation. And eGenera came back with, I'm not going to prove to you emulation happens on the CPU. I'm going to prove to you that use of this network is on the CPU. But by the time the CPUs are able to communicate over the network, the emulation has already happened. The whole point of Cisco's system is that this complicated emulation software and the logic is put on the NICs so that we don't have to put it on the processors. This might be a good place at least. I'm going to ask you one question, and then I want to get back to something you offered to do. First of all, you have a paragraph, I think, in your brief that says, well, because two of the three limitations that were the subject of their JML motion apply equally to claims one and five, then harmless error on the emulate. My problem with that is we don't know that the jury adopted either of the two that would do that for you. It might have ruled for you at the trial just on the third one which doesn't do that for you. That's a problem. That's correct. Now I want to take you up on your offer to explain what under the hood is going on with the CPUs and the MAC addresses. Sure. In the UCS system, the Fabric Interconnect is sort of the central brain, and that's the accused control node. You operate the Fabric Interconnect through a software program called UCS Manager, and you tell it, I want to have three servers in my virtual network, and it sends to three servers, okay, you're in the virtual network. It tells the NICs on those servers, this is your new MAC address. At that point, the network is established. It's created the server network that you want to have, and the NICs have their address. When the CPU, which sits behind the NIC on the server, is ready to send a message, it asks the NIC, what is your MAC address? I want to send a message. What is the from address I should use? And so the NIC says, okay, this is the MAC address that you're going to say your message is from. The message goes to the NIC. The NIC does all the complicated emulation programming. It adds tags. It reformats the message, and then it goes up to the Fabric Interconnect to get sent wherever it needs to get sent. Does it ever ask for the MAC address of the to as opposed to the from? I think the NIC would supply that MAC address. The CPU would say where it wants the message to go. In what terms? In what terms? It's not going to give the non-MAC address location. Right. It depends if it's staying in the internal network or if it's going to an external storage or communication network.  Both will happen, right? Yeah, right. So that's why the district court's analogy. So whether it's to or from, why isn't the CPU logic instruction that asks for how to fill in either the from or the to line or both logic for emulating Ethernet functionality? Because I should say why under what we currently have in the record, why isn't it reasonable for that characterization to be made? So the CPU isn't doing any of the networking itself. All of the networking is happening on the NIC. I don't know what the word networking means. Well, the Ethernet networking, the Ethernet emulation. That's just the conclusion. Okay. So when you create the message on the CPU and it goes up to the NIC, the NIC has the programming and logic to actually emulate Ethernet functionality. That is where everything gets packaged, put in its final package to go through Cisco's UCS system. What's happening on the processors is just the really basic functionality about what computers always use. Sending messages, storing things, things like that. And that's why the district court's phone analogy was appropriate here. So if you're creating a telephone network, you've got the telephones and telephone numbers that are set up. The telephone is like the NIC. It's assigned a phone number and you can pick up the phone and use it and communicate over the phone, but the person that's using the phone and sending messages isn't emulating any functionality of the telephone network. And that's effectively what the CPUs are doing here, is they're taking all the functionality created by the NIC and the control node and using that to communicate, but they themselves don't have any of the logic or functionality that would allow them to communicate over an emulated Ethernet network. They have to use what's on the NIC and the control node. So why wouldn't it be a reasonable question for a jury whether it's reasonable to say that when a processor uses the emulation that we apparently all agree is done at the NICs, that that is the processor emulating as well? Why is that not just a question of a reasonable application of that construction? So I guess two responses. One is for the same reason it's not reasonable for me to say I am part of the phone network when I dial a phone number on my phone. My phone is part of the network and the phone company has created the network. So that's not a reasonable interpretation of emulation. And the second point, Your Honor, is that these claims have these really specific limitations because eGenera wants all this networking functionality and the Ethernet functionality to be on the processors because they're trying to create processor networks. Cisco's system is just fundamentally different from that in that it's creating the server networks and that's why we put all this functionality on the NICs. We proved that backwards and forwards at trial when we had a lot more space and evidence. And that is reflected in all of eGenera's specification. So if we look at the specification at Appendix 103, it talks about how the processor logic, so this is Column 4, Lines 56 to 63. That portion of the specification specifically talks about how the processors include logic to emulate the semantics of an Ethernet driver. So this whole specification which describes, eGenera has admitted describes their BladeFrame product, this Ethernet emulation is in here because they want to use the GigaNet protocol for their internal communications. So they are requiring that these drivers, the Ethernet drivers, the Ethernet programming, actually be on the processors, not just that the processors use Ethernet functionality. Is it clear on this record that the Ethernet driver sits on the vNIC or is it on CPU? It's on the vNIC. I think that's in Appendix 4127 is the expert evidence on that. When the CPU sends a message to the vNIC, through the vNIC output or to the vNIC, it doesn't have a, and it's using Ethernet terminology, the right headers basically. There are Ethernet tags. Does it have a driver to do that? I'm not sure, Your Honor. Just one question on the new trial motion. You say that a lot of things that they complain about having gone awry at trial, I guess reference to the empty chair, witness, litigation finance discussion in closing argument, maybe things that were said about them as an MBE that were sort of arguably negative, that they only went to damages and therefore the jury didn't reach damages, so it's not relevant. But isn't the concern that all those things might have created such a cloud that it distracted the jury and was prejudicial to them by distracting the jury from the actual evidence? Just to talk through sort of the layers of review that are happening here, so the district court has reviewed his motions in Lemonet and said there wasn't a clear violation of the motion in Lemonet. So first we'd have to say there actually was a violation and you're interpreting your own orders wrong. Then EGENERA didn't object to that evidence or that argument. So then we have to say it doesn't matter that they didn't object or even raise this after the closing arguments, that there's still some kind of plain error. And then we can get to whether there was prejudice from these statements. CISCO was really clear in its closing argument that it was linking those statements to damages and this idea that there was a cloud over EGENERA, EGENERA put forth its BladeFrame product as a patent practicing product and it tried to say CISCO copied the BladeFrame and then when CISCO introduced its UCS system, that's what tanked EGENERA's sales and why EGENERA no longer practices this patent. CISCO thoroughly disproved that at trial. We proved there was no copying, that the BladeFrame product was failing in the market well before UCS was introduced and that EGENERA's decision to stop selling the BladeFrame had nothing to do with CISCO's UCS system. So it was really important for us to respond to EGENERA's narrative by explaining why BladeFrame came off the market and why that had nothing to do with CISCO but had everything to do with EGENERA's own business decisions. Thank you very much. Thank you. I don't have anything further to add. If you'd like to ask me a question, I'm happy to answer it, but otherwise, thank you. Thank you. We thank both sides. This case was submitted.